Commonwealth ex rel. McGlinn *v.* Smith, Warden.

42

Opinion by Mr. Justice Maxey, January 20, 1942:
This is a petition for a writ of habeas corpus. The petition sets forth that Charles McGlinn was tried on November 20, 1931, before Judge Harry S. McDevitt and a jury on two charges, to wit (as described): (*a*) "being armed to rob", and (*b*) "robbery, and a verdict of 'guilty' was rendered". Thereupon the petitioner was sentenced to serve a minimum of 10 years and a maximum of 20 years in the Eastern Penitentiary. He is now in the penitentiary serving this sentence. He claims that he is "unlawfully restrained and deprived of his liberty" because he at his trial "did not have coun-

sel; was not represented by counsel, was not informed of his right to have counsel; did not have counsel appointed by the court; and did nothing that would waive his constitutional right to be represented by counsel". He also denies his guilt of the crimes charged and for which he is serving sentence.

In Commonwealth's answer to the petition the above averments as to the trial, the conviction and sentence are admitted and it is further set forth: "It does not appear from the notes of testimony that the defendant was represented by counsel, nor does it appear whether or not he was informed of his right to be represented by counsel. The defendant pleaded not guilty, took the witness stand in his own defense and the jury found him guilty."

The answer further sets forth that the petitioner "was arrested August 16, 1921, and indicted on the charge of attempted larceny of an automobile and was tried and convicted (on that charge) and sentenced to not less than two and a half years in the penitentiary"; and that he was arrested on November 27, 1924, for "larceny of an automobile and receiving stolen goods, and operating the automobile without the owner's consent"., and that he pleaded guilty and was sentenced to a minimum of five years in the penitentiary. He was also arrested on another occasion on suspicion of larceny of an automobile and discharged by the magistrate.

When the petitioner was arrested on the charge for which he is now serving his sentence, one James McMonegle was also arrested as McGlinn's accomplice and both were indicted together. McMonegle pleaded nolo contendere.

The answer says: "It is perfectly evident from these facts that the relator's knowledge of court procedure was not new in 1931. It is also clear from the evidence in this case that these two defendants, McMonegle and McGlinn, about 1:30 of the morning of November 7, 1931, held up the operator of a one-man trolley at Richmond

and Cumberland Streets, the end of the trolley line, boarding the trolley as though they were passengers. McMonegle had a gun. They immediately told the operator to "stick 'em up". They robbed him of $18 and 45 tokens. There was a passenger in the car, Anthony Hildebrand, who identified the defendants as being the ones who held up the operator. They were arrested two or three blocks from the holdup. A loaded 32 calibre revolver was found on McMonegle who had part of the money, $12.20, and the balance of the money, $5.60, was found upon McGlinn, a total of $17.80, and some of the tokens. The relator in his testimony stated that he was stopped and searched for five minutes before McMonegle was arrested, but this was denied in rebuttal by the officer who made the arrest."

There is vested in the court to which a petition for a writ of habeas corpus is addressed discretion as to whether or not, on the record before it, the petitioner has made out a prima facie case for the issuance of the writ. That this petitioner is an "old offender" is undisputed. When he was returned to the penitentiary he was a "parole violator" who "owed five years' backtime" on his former sentence. That he was not ignorant of the procedure in criminal courts is obvious. That with his experience in criminal courts he must have known that he could have had counsel assigned to him upon request seems clear.

There are four decisions of the United States Supreme Court which are relied on by this and other similarly situated petitioners for release from imprisonment by writs of habeas corpus. These cases are (1) *Powell v. Alabama,* 287 U. S. 45, decided November 7, 1932, opinion by Mr. Justice SUTHERLAND; (2) *Johnson v. Zerbst,* 304 U. S. 458, decided May 23, 1938, opinion by Mr. Justice BLACK; (3) *Walker v. Johnston, Warden,* 312 U. S. 275, decided February 10, 1941, opinion by Mr. Justice ROBERTS; (4) *Smith v. O'Grady, Warden of Nebraska Penitentiary,* 312 U. S. 329, decided February 17,

1941, opinion by Mr. Justice BLACK. The decision in none of these cases requires us to grant the petitioner a hearing or to release him from imprisonment. In the first case named the scope of the decision was clearly defined by Justice SUTHERLAND as follows: "All that it is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case."[1] In the second case the petitioner was a *federal* prisoner who claimed that the right guaranteed him by the Sixth Amendment to the Constitution had been denied him, to wit: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." This Amendment applies only to prosecutions under federal laws. (*Hurtado v. California,* 110 U. S. 516, 534; *Barron v. The Mayor et al.,* 7 Pet. 243.) In Mr. Justice BLACK'S opinion in *Johnson v. Zerbst,* supra, he said: "Since the Sixth Amendment constitutionally entitles one charged with crime to the assistance of counsel, compliance with this constitutional mandate is an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty. When this right is properly waived, the

---

[1] In rendering this decision the United States Supreme Court laid down a rule which has been the law of Pennsylvania for two hundred and twenty-three years. By the Act of May 31, 1718, 1 Sm. L. 105, sec. 4, 19 PS §783, it was required that "learned counsel" be "assigned to the prisoners" "upon all trials" of "capital crimes". This is also provided for in the Acts of March 22, 1907, P. L. 31, sec. 1, 19 PS §784, which also provides for compensation and expenses for such assigned counsel.

assistance of counsel is no longer a necessary element of the court's jurisdiction to proceed to conviction and sentence. If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty." In the third case the petitioner, a *federal* prisoner, claimed that "he was deprived of the assistance of counsel for his defence in violation of the Sixth Amendment". He stated that when he told the District Attorney "he intended to plead not guilty", that official "sought to persuade him that he would be proved guilty . . ." that petitioner's request for time to "communicate with his relatives and try to obtain money to enable him to hire an attorney for his defense" was denied by the District Attorney as "not possible" and that official "told him to plead guilty, warning him that he would be sentenced to twice as great a term if he did not so plead". He did so plead, though in his petition he claimed to be innocent. The Court held: "On this record it is his right to be heard." In the fourth case the facts as described by Mr. Justice BLACK are these: "After three days in . . . jail and 'without ever having had a copy of the charge', petitioner was . . . summarily arraigned, and upon his prearranged plea of guilty, sentenced . . . to a term of twenty years imprisonment. . . . Petitioner, an uneducated layman, had no knowledge of law or legal procedure, and had never before been arrested or been in a court room. . . . His petition presents a picture of a defendant, without counsel, bewildered by court processes strange and unfamiliar to him, and inveigled by false statements of state law enforcement officers into entering a plea of guilty. The petitioner charged 'that he had been denied any real notice of the nature of the charge against him, the first and most universally recognized requirement of due process; that because of deception by the state's representatives he had pleaded guilty to a

charge punishable by twenty years to life imprisonment; that his request for the benefit and advice of counsel had been denied by the court, and that he had been rushed to the penitentiary where his ignorance, confinement and poverty had precluded the possibility of his securing counsel in order to challenge the procedure by regular processes of appeal'." The petition now before us makes out no such showing of a denial of the due process of law guaranteed by the Fourteenth Amendment.

In considering petitions for release from imprisonment by writs of habeas corpus there are certain long-established principles by which courts are guided, as follows:

First, that "The writ of habeas corpus can never be used as a substitute for an appeal. . . . The regularity of proceedings is not to be attacked in this way: *Com. v. Francies*, 53 Pa. Superior Ct. 278, 287": *Com. ex rel. Ross v. Egan, Warden*, 281 Pa. 251, 253 (126 A. 488); *Halderman's Petition*, 276 Pa. 1 (119 A. 735). In *Com. v. Seechrist*, 27 Pa. Superior Ct. 423, it was held that a writ of habeas corpus cannot be made a substitute for a writ of error, and where a party is in custody by virtue of a final decree or judgment, or process thereon, of a court of competent jurisdiction, no inquiry into the process which led to the decree is to be had, and no relief administered on habeas corpus. See also *Commonwealth of Pennsylvania ex rel. William Penland v. Ashe, Warden*, 341 Pa. 337, 19 A. 2d 464.

Second, "The writ of habeas corpus should be allowed only when the court or judge is satisfied that the 'party hath probable cause to be delivered' ": 3 Blackstone 132.

Third, "A judgment cannot be lightly set aside by collateral attack even on habeas corpus. When collaterally attacked, the judgment of a court carries with it a presumption of regularity": *Johnson v. Zerbst*, supra.

Fourth, "The determination [in habeas corpus proceedings] of whether there has been an intelligent waiver

of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused": *Johnson v. Zerbst,* supra, at p. 464.

Fifth, The remedy of habeas corpus being an extraordinary one, it can be successfully invoked only in exceptional cases, where there is a "peculiar and pressing need for it". In *Goto v. Lane,* 265 U. S. 393, 401, the Supreme Court of the United States in an opinion by Justice VAN DEVANTER said: "The remedy is an extraordinary one, out of the usual course, and involves a collateral attack on the process or judgment constituting the basis of the detention. The instances in which it is granted, when the law had provided another remedy in regular course, are exceptional and usually confined to situations where there is peculiar and pressing need for it or where the process or judgment under which the prisoner is held is wholly void. This case does not measure up to that test."

Neither does the case now before us measure up to the specified tests. We do not find in this record that the presumption of regularity has been overcome and that "the party hath probable cause to be delivered". Here is no extraordinary situation demanding the issuance of this extraordinary writ. In *Walker v. Johnston* and *Smith v. O'Grady,* supra, the facts as to the duress in one case and the deception in the other case, and the denial of the requests for counsel were so at variance with the fundamentals of fair play as to require curative judicial action.

The right guaranteed by the Pennsylvania Constitution (Art. I, sec. 9) of an accused to be *"heard by counsel"* has never been challenged or abridged in this Commonwealth; the right of an accused to be *supplied with counsel when none is asked for* was never until recent years asserted in this Commonwealth. This court has never countenanced the idea that the accused in a criminal case when the charge is other than murder is being

deprived of a constitutional right if he is not informed in advance of his trial that counsel will be assigned him upon request.

What the right of an accused "to be heard by counsel" means as this court has long understood and declared it is well expressed by the concurring opinion of Circuit Judge SIBLEY in *Saylor v. Sanford, Warden*, 99 F. 2d 605, 607 (5 C. C. A.), as follows: "The Constitution in saying that 'the accused shall enjoy the right . . . to have the assistance of counsel for his defence' means that if he provides himself counsel the court shall allow the counsel to assist and represent the accused. . . . It has never been understood that the federal courts were bound by the Constitution to furnish accused persons with counsel. A lawyer at the request of the court will represent a person unable to employ counsel, but I doubt that he ought or that the court could compel him to represent one able to employ counsel but unwilling. There are proposals pending before Congress to provide for a public defender, and for paying lawyers to defend indigent persons in some cases. All these arrangements for the defence of poor persons are acts of mercy, perhaps justice, but they are not required by the constitutional provision and have never been supposed to be." The court said: "We agree with all that is said by Judge SIBLEY in his concurring opinion."

The fact that the Supreme Court of Pennsylvania has never during its two and a half centuries of existence deemed it the duty of trial courts to provide (except in capital cases) counsel for accused persons where none was asked for strongly supports the postulate that the failure to provide counsel under the circumstances here present is *not* a denial of "due process of law", a fundamental of Anglo-Saxon justice which has been expressed in every constitution [2] of this state and upheld

---

[2] See Section 9 of the Pennsylvania Bill of Rights, in which the phrasing "unless by the judgment of his peers or the law of the land"

by its judiciary since the American Union was formed.

The Supreme Court of the United States has declared in effect that a state's long-established interpretation of its own constitution's "due process" clause is entitled to respect by the Federal judiciary. In *Otis Co. v. Ludlow Co.*, 201 U. S. 140, 154, Justice HOLMES speaking for the court said: "We cannot wholly neglect the long settled law and common understanding of a particular state in considering the plaintiff's rights. We are bound to be very cautious in coming to the conclusion that the Fourteenth Amendment has upset what thus has been established and accepted for a long time." In *Interstate Railway Co. v. Massachusetts*, 207 U. S. 79, 87, Justice HOLMES again speaking for the Court said: "The traditions and habits of centuries were not intended to be overthrown when that Amendment was passed." The same Court in *Mobile & Ohio Railroad v. Tennessee*, 153 U. S. 486, 506, said: "That Amendment conferred no new and additional rights, but only extended the protection of the Federal Constitution over rights of life, liberty, and property that previously existed under all state constitutions." [3]

(synonymous with "due process of law"), is modelled on Chapter 39 of Magna Charta. Coke in his "Institutes", Vol. 2, pp. 53, 54, implied that by "law of the land" was meant such way of proceeding against individuals as the law, whether ancient custom, the common law or statute, ordained and established.

As early as 1683 there was an effort in Pennsylvania to establish "due process of law" as a part of the fundamental law of the colony. William Penn favored it. The Crown opposed it. The only proposal for a "due process clause" in a Federal Bill of Rights came from members of the Constitutional Convention from Pennsylvania: Mott's Due Process of Law, pages 99, 100, 149. See also McMaster & Stone's Pennsylvania and the Federal Constitution, p. 461.

[3] Before the Fourteenth Amendment was adopted eighty percent of the states had "due process" clauses in their constitutions. Now all states except five have such clauses. New Jersey has never had a "due process" clause, and Ohio, Indiana, Oregon and Kansas each have clauses somewhat similar to the "due process" clause: Mott's "Due Process of Law", pp. 20, 26, 27.

If this petition presents a case of "apparent need for" the "extraordinary remedy" of habeas corpus, it is reasonable to expect that our courts will soon be flooded with like petitions. In this State during the years 1939-1940 there were in our criminal courts 37,221 pleas of guilty, 10,755 convictions in which a jury trial was waived, and 6,104 convictions after a jury trial. In the same period there were 3,703 defendants sentenced to state prisons or reformatories and 18,449 sentenced to local jails.[4] If even 20% of the defendants who are here annually sentenced to prison were "without benefit of counsel" and seek their discharge by writs of habeas corpus issuing out of the appellate courts, these two courts will annually have to hear and dispose of 1,107 such cases. Our courts should not for the reasons offered in this petition turn loose upon society the hundreds of convicts who were sent to prison after pleading guilty or being adjudged guilty by a jury, unless the law imperatively requires them to do so, and there is no such requirement.

The root of the American system of government is found in the principle of duality of sovereignty.[5] The courts have been careful not to disturb the fundamental division of powers between nation and state. Neither nation nor state ever intended that either sovereignty's administration of its criminal laws should be reviewable by the courts of the other sovereignty except in those rare and extraordinary instances when a state criminal court denies a citizen that "due process of law" guaranteed him by the Fourteenth Amendment. The United States Supreme Court has often declined in criminal

[4] This data is from the Chief of the Census Bureau, Department of Commerce.

[5] LORD BROUGHAM said of the American Union: "The devising means for keeping the Union's integrity as a federacy while the rights and powers of the individual states are maintained entire, is the very greatest refinement in social policy to which any age has given birth.' Brougham's "Political Philosophy", 2d ed. (London, 1853), Part 3, p. 336.

cases, no matter how strong an appeal to its sense of justice the petition might make, to take any steps in the direction of "breaking down the lines which separate the states and of compounding the American people into one common mass", a thing which Chief Justice MARSHALL in *M'Culloch v. Maryland,* 4 Wheat. 316, 403, said: "No political dreamer was ever wild enough to think of."

In *Knewel v. Egan,* 268 U. S. 442, the United States Supreme Court in an opinion by Mr. Justice STONE (now Chief Justice) said: "It is fundamental that a court upon which is conferred jurisdiction to try an offense has jurisdiction to determine whether or not that offense is charged or proved. Otherwise every judgment of conviction would be subject to collateral attack and review on *habeas corpus* on the ground that no offense was charged or proved. It has been uniformly held by this Court that the sufficiency of an indictment cannot be reviewed in *habeas corpus* proceedings" (citing cases). In *Frank v. Mangum,* 237 U. S. 309, 326, the United States Supreme Court in an opinion by Justice PITNEY said: "If he [the prisoner] is held in custody by reason of his conviction upon a criminal charge before a court having plenary jurisdiction over the subject-matter or offense, the place where it was committed, and the person of the prisoner, it results from the nature of the writ itself that he cannot have relief on *habeas corpus. . . .* As to the 'due process of law' that is required by the Fourteenth Amendment, it is perfectly well settled that a criminal prosecution in the courts of a State, based upon a law not in itself repugnant to the Federal Constitution, and conducted according to the settled course of judicial proceedings as established by the law of the State, so long as it includes notice, and a hearing, or an opportunity to be heard, before a court of competent jurisdiction, according to established modes of procedure, is 'due process' in the constitutional sense" (citing cases).

In *Ex parte Tobias Watkins,* 28 U. S. 193, 201, Chief Justice MARSHALL speaking for the court said: "The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment. . . . The petitioner is detained in prison by virtue of the judgment of a court, which court possesses general and final jurisdiction in criminal cases. Can this judgment be re-examined upon a writ of habeas corpus? This writ is, as has been said, in the nature of a writ of error, which brings up the body of the prisoner with the cause of commitment. The Court can undoubtedly inquire into the sufficiency of that cause; but if it be the judgment of a court of competent jurisdiction, especially a judgment withdrawn by law from the revision of this court, is not that judgment in itself sufficient cause? Can the court, upon this writ, look beyond the judgment, and reëxamine the charges on which it was rendered. A judgment, in its nature, concludes the subject on which it is rendered, and pronounces the law of the case. The judgment of a court of record whose jurisdiction is final, is as conclusive on all the world as the judgment of this court would be. It is as conclusive on this court as it is on other courts. It puts an end to inquiry concerning the fact, by deciding it. . . . It would be strange if, under colour of a writ to liberate an individual from unlawful imprisonment, we could substantially reverse a judgment which the law has placed beyond our control. An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous."

Recent decision by Federal courts show that they do not regard failure to provide counsel to defendants in criminal cases as a denial of "due process of law". In

*Saylor v. Sanford, Warden,* 99 F. 2d 605, 606, supra (1938), it was held by the Fifth Circuit Court of Appeals that the court did not lose jurisdiction when it permitted the accused to be arraigned without assistance of counsel. In the concurring opinion in that case Circuit Judge Sibley said: "Despite the breadth of some of the language of the decision [*Johnson v. Zerbst,* 304 U. S. 458], the case ought not to be taken as establishing the doctrine that a court has no jurisdiction over an accused person who has no lawyer unless he expressly waives counsel or the court gets him one." In *Sanford, Warden, v. Robbins,* 115 F. 2d 435 (1940), the Circuit Court of Appeals of the Fifth Circuit held that defendants who have been convicted without counsel in ordinary cases, though there was no express waiver of counsel, are not held under a void sentence. In that case Circuit Judge Sibley said: "Despite some of the language in *Johnson v. Zerbst,* we do not think it accurate to say that a duly organized court, undominated by mob spirit or any outside force (compare *Frank v. Mangum,* 237 U. S. 309, 35 S. Ct. 582, 59 L. Ed. 969), but proceeding in an orderly way, loses its jurisdiction to try the accused because it rules wrongly upon some question of law, even constitutional law. And we do not think counsel for the accused appointed by the court, where none has been secured by him, is indispensably necessary to the due organization of the court. Without regard to the grade or seriousness of crimes, the Fifth Amendment requires, if a person accused of crime procures counsel, that the court shall permit such counsel to represent and assist the accused, but it does not require the court to furnish counsel." In that case the United States Supreme Court on March 10, 1941, found "no ground upon which writ of certiorari should be issued" and denied the petition: 312 U. S. 697, 61 Supreme Court Reporter 737.

When in the *Sacco-Vanzetti* case, Justice Holmes of the United States Supreme Court was petitioned for a writ of certiorari, he said: "This is a case of a crime

charged under state law and tried by a State Court. I have absolutely no authority as a Judge of the United States to meddle with it. If the proceedings were void in a legal sense, as when the forms of a trial are gone through in a Court surrounded and invaded by an injuriated mob ready to lynch prisoner, counsel and jury if there is not a prompt conviction, in such a case no doubt I might issue a habeas corpus—not because I was a Judge of the United States, but simply as anyone having authority to issue the writ might do so, on the ground that a void proceeding was no warrant for the detention of the accused. No one who knows anything of the law would hold that the trial of Sacco and Vanzetti was a void proceeding. They might argue that it was voidable and ought to be set aside by those having power to do it, but until set aside, the proceeding must stand. . . . The relation of the United States and the Courts of the United States to the States and the Courts of the States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years and can not be disposed of by a summary statement that justice requires me to cut red tape and to intervene."

Later when petitioned for a writ of habeas corpus in the same case, Justice HOLMES said: "I have no authority to issue it unless it appears that the Court had not jurisdiction of the case in a real sense so that no more than the form of a court was there. But I cannot think that prejudice on the part of the presiding judge, however strong, would deprive the Court of jurisdiction, that is of legal power to decide the case, and in my opinion nothing short of a want of legal power to decide the case authorizes me to interfere in this summary way with the proceedings of the State Court": The *Sacco-Vanzetti* case, Vol. 5, pp. 5516 and 5532.

Justice BLACK of this court in *Passmore Williamson's Case*, 26 Pa. 9 (1855), expressed sound views on the issuance of the writ of habeas corpus. That was a case in which the complaint was that petitioner was unjustly

held in custody under a commitment of the District Court of the United States and an application was made to the Supreme Court of Pennsylvania for a writ of habeas corpus. Justice BLACK in refusing the application said: "There may be cases in which we ought to check usurpation of power by the federal courts. If one of them should presume to take out of our hands a prisoner convicted of contempt in this court, we would resist it by all proper and legal means. What we would not permit them to do against us we will not do against them. We must maintain the rights of the state and its courts; for to them alone can the people look for a competent administration of their domestic concerns; but we will do nothing to impair the constitutional vigour of the general government which is 'the sheet anchor of our peace at home and our safety abroad'. . . . It is argued . . . that we cannot refuse the writ without a frightful violation of the petitioner's rights, no matter how plainly it may appear on his own showing that he is held in custody for a just cause. . . . Can it be possible that the law and the courts are so completely under the control of their natural enemies that every class of offenders against the Union or the state, except traitors and felons, may be brought before us as often as they please, though we know beforehand, by their own admissions, that we cannot help but remand them immediately? If these questions must be answered in the affirmative, then we are compelled, against our will and contrary to our convictions of duty, to wage a constant warfare against the federal tribunals by firing off writs of *habeas corpus* upon them all the time. The punitive justice of the state would suffer still more seriously. The half of the Western Penitentiary would be before us at Philadelphia, and a similar proportion from Cherry Hill and Moyamensing would attend our sittings at Pittsburgh. To remand them would do very little good; for a new set of writs would bring them all back again. A sentence to solitary confinement would be a sentence that the convict should

travel for a limited term up and own the state in company with the officers who might have him in charge. . . ." In his concurring opinion Justice Lowrie said: "It is an essential element of judicial authority that it must be the judge of its own jurisdiction; and I do not know that this rule is peculiarly applicable to the higher courts. The lowest must act upon it, subject to the higher social law that is involved in official subordination. Often the question may be erroneously decided. Often such decisions may result in great injury to the citizen, but it is the lot of government to err, because it is human, and a man of well-trained mind will think it no great hardship to submit to authority even in error. In the name of order, the country demands, and has the right to demand it. It is usual to say, even of foreign judgments, that, if pronounced by a competent tribunal, and carried into effect without our assistance, they are conclusive of the question decided. . . . Not that the United States is a foreign country, but that its courts belong to a different system from the state courts, and thus these respective authorities are, as authorities, foreign to each other. Each must respond to its own superiors; neither can call the other officially to account. . . . Manufacture and repair constitutions and bills of right as we may; multiply checks and restrictions upon official functions as we may, we cannot shut out human error and its consequences, which are sometimes distressing—while we may carry our suspicions of government so far as to take away its real efficiency as a means of preserving social order; . . . In the name of the order which we represent and enforce, I decline any and every usurpation of power or control over the United States judiciary; it being a system collateral to ours, as complete and efficient in its organization, and as legitimate and final an authority as any other. I concur in refusing the writ."

Every person's security against being deprived by state action, of life, liberty or property, without due process of law is under *national* protection since the

Fourteenth Amendment was adopted on July 21, 1868, yet as Justice BRADLEY, speaking for the United States Supreme Court in *Missouri v. Lewis* (1879), 101 U. S. 22, 31, said: "The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each state prescribes its own modes of judicial proceeding." Cooley in his edition of Story's "Commentaries on the Constitution" said: (sec. 1947) "No more under the Fourteenth Article than previously can the Federal government interfere with the mode prescribed for the trial of State offences: whatever is established [by the state] will be due process of law, so that it be general and impartial in operation, and disregard no provision of Federal or State constitution." The state is traditionally[6] the protector of the lives, liberty and property of its own people and the courts of this Commonwealth have ever been vigilant in upholding that "due process of law" which "means such an exertion of the power of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as these maxims prescribe for the class of cases to which the one in question

---

[6] Hamilton in the Seventeenth Federalist paper wrote: "There is one transcendent advantage belonging to the province of the State governments. . . . I mean the ordinary administration of criminal and civil justice". The state is "the immediate and visible guardian of life and property."

Jefferson said: "It is of immense consequence that the States retain as complete authority as possible over their own citizens." (Jefferson to Monroe, Washington editions of "Writings of Thomas Jefferson", Vol. 4, p. 200). "I deem the essential principles of our government [to be] . . . the support of the State governments in all their rights, as the most competent administrators for our domestic concerns . . ." (Jefferson's First Inaugural Address, Messages and Papers of the Presidents, Vol. 1, p. 323).

belongs": Cooley's "Constitutional Limitations", 8th ed., Vol. 2, p. 741.

The administration of the criminal laws here as elsewhere is necessarily only an approximation toward that ideal of *absolute justice* which is said to be unattainable. In the long-established processes of our courts, we believe *substantial* justice *is* attained and we find in the record now before us no such impairment of the prisoner's constitutional rights as to require his release.

The Commonwealth presented evidence of probative value against this accused and he testified freely in his own behalf. The case presented an issue of fact for the jury. Defendant did not ask for the assistance of counsel. With his penitentiary "background" and his "experience" in the criminal courts he must have known that professional assistance would have been given him upon request and therefore he must be deemed to have intelligently waived his "right to be heard by counsel".

To discharge from custody this man who has been thrice convicted of felonies, upon the bare technicality that the trial judge did not inquire whether he wished to have counsel assigned him would justify the reproach which William Howard Taft (later Chief Justice of the United States) expressed on June 26, 1905, as follows: "When a court of highest authority interposes a bare technicality between a defendant and his just conviction, it is not too much to charge some of the laxity in our administration of the criminal law to a proneness on the part of courts of last resort to find error and to reverse judgments of conviction."[7]

The writ is refused.

---

[7] Taft: "Present Day Problems", p. 353.