Commonwealth *v.* Novak, Appellant.

200

Argued November 20, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused April 27, 1959.

*Walter Stein,* with him *Mervyn R. Turk,* and *Berger and Gelman,* for appellant.

*Paul R. Sand,* Assistant District Attorney, with him *Raymond R. Start,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, March 16, 1959:

A jury found defendant guilty of murder of the first degree and fixed the penalty at death in his trial for the murder of Katherine Jones, and also found him guilty of murder of the first degree and fixed the penalty at death in his trial for the murder of Ella K.

Jones, Katherine's daughter. Defendant filed a motion in arrest of judgment and a motion for a new trial which were dismissed by the lower Court. The lower Court thereupon sentenced him to death. From the judgment and sentence defendant took this appeal.

Because this is a capital case we shall discuss every one of defendant's contentions which may have any possible merit.

The first question presented was whether the Commonwealth made out a prima facie case, and if so whether the verdict was against the weight of the evidence.

Defendant and Ella Jones were engaged to be married. They, with her mother, were living at 500 Fern Street, Darby. There was considerable friction in the home for a month. According to defendant, Ella and her mother kept reminding him that he was on probation and that they could have him arrested at any time. He became incensed when Ella and her mother allowed a coffee pot to burn; he became incensed when Ella's mother insisted on bringing old furniture into the house, and when she sold some tools, although they were her property. Because of their almost constant arguments, defendant demanded that Ella convey her interest in the property to him, which she did on February 1, 1955. On the evening of that day, Ella had defendant arrested on charges of drunk and disorderly conduct, threatening to kill and breach of the peace. At the hearing before the Justice of the Peace, Ella testified that defendant had kicked her on the leg and had threatened her several times with a gun which he had in the house. After they returned home, they continued to argue during the next two days.

On the morning of February 4, 1955, defendant and Ella again became involved in an argument over his recent arrest. Ella refused a reconciliation. When

she started to leave the house to go to work, defendant ran to a closet in the living room, got his revolver and fired seven bullets into her head and body. Many of the shots were fired with the muzzle of the gun within 24 inches of the victim's body, and one at the distance of 18 inches. Since the cylinder of the revolver held but five cartridges, the jury could well have found that the defendant must have paused to reload his gun. Ella's death was caused by one or more of these bullets. Defendant then went to the rear of the house and shot Ella's mother as she was standing on the landing just outside the kitchen door calling for help. He fired two bullets into Mrs. Jones. Her death was caused by one or both of these bullets. The murder of Mrs. Jones was witnessed by Mrs. Grace Wood, a neighbor who was walking past the house at the time; there were no eyewitnesses to the shooting of Ella Jones.

Officers arrived quickly and were met at the front door by the defendant who immediately said "I killed them." Defendant added "I have no gun." The officers then went into the house and found Ella Jones lying on the floor of the living room moaning in pain. Mrs. Katherine Jones was found lying in the snow at the bottom of the steps leading down from the kitchen door. She was apparently dead. The women were rushed to the hospital and were pronounced dead on arrival. Defendant gave detectives several false leads as to what he had done with the gun. It was found after many hours of search secreted in an automatic gas heater in the basement.

There is not the shadow of a doubt as to defendant's guilt. These were two cruel, heartless, savage murders. Defendant willfully, deliberately and premeditatedly got a gun and shot and killed Ella Jones and her mother after numerous threats and after Ella

refused a reconciliation. Defendant alleges that the killings were without the slightest motive and because of that and because he was in a state of intense excitement, the killings could not amount to murder in the first degree. "Evidence to prove motive, intent, plan or design are admissible [citing cases].": *Commonwealth v. Homeyer*, 373 Pa. 150, 159, 94 A. 2d 743. However, "proof of motive is always relevant but never necessary.": *Commonwealth v. Malone*, 354 Pa. 180, 188, 47 A. 2d 445. Moreover, in this case the motivation was obvious, namely, hatred and resentment. Mrs. Freedman, a witness for defendant, whose home defendant had visited on February 2nd, testified that defendant called Ella's mother a foul name, said he "hated her guts" because she was keeping Ella away from him, and said "I ought to kill her." Defendant testified on the witness stand "There was murder in my heart the day she [Ella] had me arrested [February 1st]." He testified that after his return from the hearing on February 1st he looked for the gun and failed to find it, but added "I would have believed I would have killed the both of them that night there and then."

When defendant was arrested and taken to the police station he was "perfectly calm, he was talking like an ordinary person would talk if you had a conversation with them." When he was asked by one of the arresting officers why he had shot the women, defendant replied "They were robbing me." All the ingredients necessary for first degree murder are so clearly present in this case and the evidence of defendant's guilt is so overwhelming that a citation of authorities to support the conviction is unnecessary.

Defendant contended prior to arraignment and before trial and on this appeal that he lacked the mental capacity requisite to standing trial.

## Defendant's Mental Capacity To Stand Trial And To Make A Rational Defense

". . ., the test at common law and employed by the courts in determining the mental capacity of a defendant to stand trial or to be sentenced or executed is not the M'Naghten 'right or wrong' test but whether the defendant is able to comprehend his position and make a rational defense.": *Commonwealth v. Moon*, 383 Pa. 18, 23, 117 A. 2d 96.

Prior to trial and pursuant to the Mental Health Act of 1951 as amended, the lower Court appointed a Commission to examine defendant. We adopt the following excerpt from that Court's opinion on the question of defendant's ability to stand trial:

"The commission thereupon proceeded to make a psychiatric examination of the defendant, and a neurologic examination was performed independently by the two physicians. In due course, the commission filed its report with this Court in which it found, inter alia, that Edward Novak is not mentally defective; that there is no evidence of organic disease of the nervous system; that he shows a profound personality disorder that has led to all types of aggression and anti-social behavior, but *he is not mentally ill*;* that he is not insane, but can distinguish right from wrong; that he is able to comprehend his position with relation to the crimes of which he stands accused, *to confer with his counsel in an intelligent manner to prepare his defense if he so desires* and to make a rational defense to the crimes of which he stands accused."

The lower Court then held that defendant was not mentally ill within the purview of the Mental Health Act: "After a thorough study of the commission's report and the evidence upon which it was based, and in

---

* Italics throughout, ours.

206

the exercise of our own independent judgment (Commonwealth v. Patskin, 375 Pa. 368, 375), . . ."

"We have read and re-read the commission's report and the evidence upon which it was based. It is our considered opinion, after mature and deliberate study, that the commission discharged the duties of its appointment with ability, fidelity and complete impartiality. The report gives every evidence of thorough, painstaking consideration and preparation. We find no inconsistency or contradiction in the commission's findings and conclusions. And such findings and conclusions, in our opinion, find abundant support in the evidence.

"The commission's estimate of defendant's general attitude throughout the examination, accords with our own impression after repeated readings of the evidence. After remarking that defendant showed during the examination, evidences of marked hostility and aggression towards others, the commission said: 'However, during the course of our examination he was polite and co-operative. When he dealt with matters irrelevant to the questioning he agreed to drop such discussion and return to the topic at hand. A half dozen times during the interview he went into violent rages screaming, crying, beating his fist on the table, yet, when he was ordered to desist and return to the orderly questioning, he did so and was relevant once more.' . . .

"We were not, of course, bound by the findings and conclusions of the commission. As the Supreme Court said in Commonwealth v. Patskin, 375 Pa. 368, 375, 'If a commission is appointed its findings are advisory and not mandatory upon the court—under the Act it is the Court and not the psychiatrist or the Sanity Commission which must be satisfied that the petitioner is insane or mentally ill.' We were of opinion that

defendant was not mentally ill. On occasions when we had opportunity to observe him, there was nothing in his bearing, appearance, or demeanor suggestive of mental illness."

Defendant also contends that his statutory and Constitutional rights were violated because his counsel was not present when he was examined by the Commission and therefore could not cross-examine. Neither counsel for defendant nor counsel for the Commonwealth were present at the psychiatric examination of defendant. Indeed, defendant's counsel said they were satisfied not to be present. In *Commonwealth v. Iacobino*, 319 Pa. 65, 178 A. 823, the Court said (page 69) : "A defendant charged with a crime who invokes a statutory or common law remedy to determine his sanity before trial or after conviction has no constitutional right to be confronted by or cross-examine witnesses or the members of the commission appointed to ascertain that fact. Such inquiries are for the determination of a fact apart, separate and distinct from that of guilt of the crime itself, as to which trial or sentence may or may not be ordered. The appointment is not demandable of right and if it is contended the members appointed are biased or otherwise incompetent, objection, with the reasons therefor, should be made to the court at the time of appointment. The court may then determine whether it has made a mistake in the selection of persons to inform its conscience. Where witnesses are produced, and they may be by either side, it is customary for counsel to appear and examine or cross-examine them if necessary. The matter is entirely in the control of the court appointing these officers, who in the interest of justice will see that the accused is not prejudiced by the course of the investigation."

## Insanity

Defendant's sole defense at the trial was that he was insane at the time of the killings. Once again we quote with approval from the able and convincing opinion of the lower Court:

". . . In support of his defense of insanity, and of his contention of inability to stand trial, defendant relied upon the testimony of three psychiatrists, who had examined him within a few months after the killings. The Commonwealth met this issue with the testimony of two psychiatrists, and some lay testimony. It is necessary here to relate something of the defendant's attitude and conduct at the trial, for the bearing it may have on the question of his mental condition.

"Defendant's behavior was perfectly normal and proper during the first two days of the trial. At the opening of court on the third day, however, he erupted into violence. He lunged and thrashed about in the most reckless and disorderly manner, and made an assault upon a court officer, all the while calling out in a loud and boisterous voice, so that it required considerable force to subdue him and remove him from the courtroom. He engaged in substantially similar conduct on other occasions during the trial. It was necessary at times to keep him under physical restraint in the courtroom, and to take measures to prevent him from continually interrupting the proceedings with his raucous and belligerent cries.

"There was abundant testimony that on the occasions when defendant was removed from the presence of the jury, following these outbursts, he soon subsided and became very calm, orderly and submissive, except for one or two minor incidents. On defendant's first removal, it was testified, his immediate concern was for his watch, his glasses and some papers he had brought to trial. A witness stated that when he asked

defendant why he acted as he did in the courtroom, defendant asked the witness what he would do if he 'wanted to get attention.' The Commonwealth produced testimony to show that in conversations between defendant and the trial Judge, and between defendant and the President Judge—conversations had at defendant's urgent and repeated solicitations and in the presence of counsel—defendant was never abusive or violent in either language or conduct, but was uniformly courteous, polite and respectful. One witness testified, 'He was very calm, asked very intelligent questions, talked very coherently, and his general behavior was that of a normal person.' Other witnesses testified that defendant fully comprehended and understood his position. It was also shown that defendant frequently conferred with counsel in the course of the trial, both during the selection of the jury and during the questioning of witnesses. . . .

"The psychiatric testimony on both these issues was extensive, and was in irreconcilable conflict. In addition to the medical testimony, however, the jury had before them the defendant's behavior in court, and the testimony as to his completely changed attitude and conduct when he was out of their presence. The jury may have considered whether or not the defendant was feigning insanity. They may have questioned whether defendant's pleas of insanity at the time of the killings, and of mental inability to stand trial, were entered in sincerity and good faith, or by way of mere stratagem and artful device. Be that as it may, our study and analysis of the record leads us to the conclusion that the preponderating weight of the evidence supports the jury's findings that the defendant was sane at the time of his commission of the homicides, and that he was able to comprehend his position and make a rational defense."

There was ample evidence to support the finding of the jury and of the lower Court that defendant was sane at the time of the homicides and was competent to stand trial and make a rational defense at his trial.

Defendant further contends that he was entitled to have his trial continued and a separate trial allowed him on the question of his sanity. There is absolutely no merit in this contention. No Constitutional or statutory or other rights of defendant were violated. Cf. *Commonwealth v. Iacobino*, 319 Pa., supra; *Commonwealth v. Ragone*, 317 Pa. 113, 123, 176 A. 464; *Commonwealth v. Cilione*, 293 Pa. 208, 216, 142 A. 216; *Commonwealth v. Scovern*, 292 Pa. 26, 29, 140 A. 611; *Webber v. Commonwealth*, 119 Pa. 223, 13 A. 427.

Defendant next contends his Constitutional rights were violated by the application of the rule in *M'Naghten's Case*. Defendant, as other defendants repeatedly have, asks us to reject or change the rule laid down in *M'Naghten's Case*, 8 Eng. Rep. 718, which was adopted as the law of Pennsylvania in *Commonwealth v. Mosler*, 4 Pa. 264. These cases established the so-called "right and wrong" test for insanity, when insanity is raised as a defense by a defendant. Defendant desires us to adopt some undefined psychiatric test. Once more, we refuse to do so. The *M'Naghten Case* rule or "the right and wrong test" has been repeatedly reaffirmed by this Court—as recently as 1955. See *Commonwealth v. Moon*, 383 Pa. 18, 23, 117 A. 2d 96; *Commonwealth v. Patskin*, 375 Pa. 368, 371, 100 A. 2d 472; *Commonwealth v. Heller*, 369 Pa. 457, 461, 87 A. 2d 287; *Commonwealth v. Neill*, 362 Pa. 507, 514, 67 A. 2d 276.

In *Commonwealth v. Patskin*, supra, the Court said (page 371): "The law of Pennsylvania (following M'Naghten's Case, 10 Cl. & Fin. 200 (1843)) provides that the test of insanity is whether the defendant at

the time of the commission of the killing knew the nature and consequences of his acts, or the difference between right and wrong: Commonwealth v. Heller, 369 Pa., supra."

In *Leland v. State of Oregon,* 343 U. S. 790, 800, 801, the Court said: "Much we have said applies also to appellant's contention that due process is violated by the Oregon statute providing that a 'morbid propensity to commit prohibited acts, existing in the mind of a person, who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor.' That statute amounts to no more than a legislative adoption of the *'right and wrong' test of legal insanity in preference to the 'irresistible impulse' test.* Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' "

Defendant next contends that it was error to admit into evidence the bloody clothing and photographs of the dead women, since they were irrelevant and inflammatory. There is no merit in this contention. When a defendant pleads not guilty, they are never irrelevant, although some of the photographs may be

inadmissible because too inflammatory. In *Commonwealth v. Ballem*, 386 Pa. 20, 123 A. 2d 728, the Court said (page 26) : "Pistols, fruits of the crime, clothing, parts of the body of the person killed, everything pertaining to the crime which will aid the jury in its consideration of the (alleged) crime and the guilt or innocence of the accused, is admissible." This has been the law for centuries. The law is likewise well settled that in the trial of criminal cases photographs of the victim and of the scenes of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any, connection defendant had with it; however, they are not admissible for the purpose of exciting or inflaming the emotions of the members of the jury. The admission of photographs is largely within the discretion of the trial Court and will not be reversed except for a flagrant abuse of discretion : *Commonwealth v. Patskin*, 375 Pa., supra; *Commonwealth v. Bibalo*, 375 Pa. 257, 100 A. 2d 45; *Commonwealth v. Smith*, 374 Pa. 220, 97 A. 2d 25; *Commonwealth v. Moon*, 389 Pa. 304, 132 A. 2d 224; *Commonwealth v. Gibbs*, 366 Pa. 182, 76 A. 2d 608; *Commonwealth v. Sydlosky*, 305 Pa. 406, 158 A. 154; *Commonwealth v. Simmons*, 361 Pa. 391, 65 A. 2d 353. When gruesome pictures, or pictures tending to inflame the jury's emotions, are admitted in evidence, the trial judge should explain to the jury their purpose and admonish them not to permit the photographs to inflame their emotions or to prejudice them against the defendant. All the pictures which were admitted by the trial judge in this case were properly admitted. Furthermore, the trial judge explained to the jury the purpose for which the photographs were admitted and carefully admonished them against permitting the photographs to prejudice them against defendant.

The final contention made by defendant was that his Constitutional rights were violated because he was deprived of counsel of his own choice.

A defendant has a Constitutional right to choose at his own cost and expense any lawyer he may desire: Constitution of Pennsylvania, Art. I, §9; Constitution of the United States, Amend. V (due process), Amend. XIV (due process); *Commonwealth v. Thompson,* 367 Pa. 102, 106, 79 A. 2d 401. In a capital case, if a defendant is not financially able to employ counsel or if for any reason he is unwilling or unable to engage counsel, the Court will appoint, at the expense of the County, a lawyer to represent the defendant: *Commonwealth v. Thompson,* 367 Pa., supra; *Commonwealth ex rel. McGlinn v. Smith,* 344 Pa. 41, 45, 24 A. 2d 1.

Defendant engaged two capable and experienced lawyers who were familiar with criminal practice and paid them a very substantial fee. Four months thereafter, defendant became dissatisfied with his counsel. After a while he was not only dissatisfied but actually hostile to his counsel. Counsel then petitioned the Court for leave to withdraw from the case. Defendant and his counsel were told by the Court orally and the Court entered an Order that counsel would be allowed to withdraw as soon as defendant procured other counsel who would enter an appearance for him. At no time either before trial, during trial, or after trial did defendant procure another attorney who was willing to appear for him at the trial or in connection with his indictment. Defendant states that he contacted Francis R. Lord, a member of the Delaware County Bar, for the purpose of retaining him as counsel. "At the bar of the [lower] Court Mr. Lord stated that he had discussed the matter with the defendant but had been unable to come to terms with him and would not represent him." Counsel for defendant then filed a

petition with this Court to be relieved as defendant's counsel. This Court denied their petition. When defendant's case was called for trial on January 7, 1957, defendant asked the trial judge to let him "fight this with another lawyer". The trial judge refused this request. On the fourth day of the trial, defendant's counsel made a motion at side bar requesting the trial judge to relieve them from further representation of defendant, because of his dissatisfaction and lack of confidence in them, and his refusal to co-operate properly with them. This motion was denied.

The trial judge's rulings were not a denial of defendant's Constitutional rights. Constitutional provisions, like all laws, must receive a sensible and reasonable construction. The accused's right to choose counsel must be exercised at a reasonable time and in a reasonable manner. Defendant had a period of almost two years in which to procure counsel to his liking and in whom he could have confidence. He was never denied the opportunity to exercise this right. Defendant knew when his case would be called for trial. He could not wait until the very day of his trial to choose another counsel. This would be, under the circumstances here present, an unreasonable interpretation of his Constitutional rights and would shackle not promote Justice. The lower Court in its opinion said: "We take the opportunity to state . . . that counsel at all times have discharged the duties of their employment with diligence, fidelity and outstanding ability." We add that counsel for defendant, in their briefs and in their oral argument before this Court, have ably presented every factual argument and every legal argument which could be presented by astute counsel. If a defendant who engages his own counsel refuses for two years to engage other counsel and waits until the trial of his case to demand an opportunity to engage

other counsel, he can repeat this strategy every time his case is called for trial, and society would not receive the protection and equal Justice to which both they and the accused are entitled.

We decide that the evidence amply supported the verdict and the death penalty fixed by the jury; that defendant's mental condition did not prevent his making as good a defense as was possible in the light of the homicides which he committed; that there was ample evidence from which both the jury and the Court below could justifiably conclude that defendant was sane; that defendant had a fair trial; and that he was not deprived of any of his Constitutional rights.

Judgment and sentence affirmed.

Mr. Justice MUSMANNO dissents.