Commonwealth *v.* Moon, Appellant.

Argued May 23, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Thomas A. Waggoner, Jr.,* with him *Edward Dumbauld,* and *E. H. Beshlin,* for appellant.

*Frank P. Lawley, Jr.,* Deputy Attorney General, with him *David S. Kohn,* Special Prosecutor and *Harrington Adams,* Deputy Attorney General, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, October 4, 1955:

The pivotal and important question presented by this appeal is whether The Mental Health Act of 1951 changed the common law test for staying criminal proceedings after verdict but prior to sentence or execution. Inasmuch as appellant's motion for a new trial has not been argued and sentence has not been pronounced we are not concerned with possible trial errors or the merits of appellant's conviction.

On January 13, 1954 the appellant, Norman W. Moon, appearing before the Court of Quarter Sessions of Warren County on a charge of failure to comply with a support order, shot and fatally wounded the Honorable ALLISON D. WADE, President Judge of the 37th Judicial District. After apprehension, appellant was indicted, tried and on May 25, 1954 convicted of murder in the first degree. The jury, rejecting appellant's sole defense of insanity, fixed the penalty at death. About two months thereafter, on July 31, 1954, while appellant was confined in the Warren County Jail pending disposition of his motion for new trial, the county sheriff, in his capacity as keeper of the jail, petitioned the court for the appointment of a sanity commission under Section 344 of The Mental Health Act of June 12, 1951, P. L. 533, as amended, 50 PS §1224. This section of the Act provides, inter alia, that a petition for the commitment of any person detained in any penal or correctional institution who is thought to be mentally ill or in such condition that he requires care in a mental hospital, or who is thought to be a mental defective (except mental defectives convicted of first degree murder) may be made by counsel for the prisoner or the superintendent of the institution where defendant is detained or by any responsible person.

Without holding a hearing on the petition, the court by an order dated July 31, 1954, appointed a commission composed of two physicians and an attorney to investigate appellant's mental condition. After examining the defendant and holding hearings at which testimony and statements were taken, the commission on October 13, 1954 filed its report with the court in which it found the following ultimate facts: "a. Norman W. Moon is in fact mentally ill. b. Norman W. Moon's mental illness is that of dementia praecox of the paranoid type. c. This illness is chronic and continuing. d. Norman W. Moon is a proper subject for commitment to a mental hospital.".

The findings also contained answers to three specific questions submitted by the court on October 8, 1954, namely,

"(1) Regardless of what Moon's ideas or his feelings may be as to his own acts or behavior and although he may have a mental abnormality or illness, has he sufficient intelligence or mental ability to comprehend that by generally accepted standards an unjustifiable and inexcusable killing is considered to be wrong and a crime?

"Answer. Yes, except during the two periods of acute mental disturbance that he has exhibited.

"(2) Regardless of what Moon's ideas or his feelings may be as to his own acts or behavior and although he may have a mental abnormality or illness, has he sufficient intelligence or mental ability to comprehend that he has been tried by a jury which found him legally responsible for such a killing and guilty of murder in the first degree, and the jury also set death as the penalty which it felt was the proper one in his case?

"Answer. Yes, except during the two periods of acute mental disturbance that he has exhibited.

"(3) Regardless of what Moon's ideas or his feelings may be as to his own acts or behavior and although he may have a mental abnormality or illness, has he sufficient intelligence or mental ability to comprehend that if the penalty set by the jury is carried out and he is sent to the electric chair, it will be in punishment for the crime of which the jury found him guilty?

"Answer. Yes, except during the two periods of acute mental disturbance that he has exhibited."[1]

After reviewing the evidence taken before the sanity commission and its report and, as well, the evidence adduced at the trial, the court below on October 21, 1954 filed an opinion and order finding appellant legally sane and ordering the proceedings to continue. Exceptions filed to this order by appellant were subsequently dismissed by an opinion and order dated February 9, 1955. This appeal followed. As The Mental Health Act of 1951 neither provides for nor prohibits an appeal to this Court where commitment is denied, review by certiorari may be had in the broadest sense and we may examine the record to determine whether the court's finding amounted to an error of law or an abuse of discretion as appellant contends: *Commonwealth v. Patskin,* 375 Pa. 368, 375, 100 A. 2d 472.

Prior to any legislation on the subject, Pennsylvania and the vast majority of other jurisdictions consistently followed and applied the common law principle that no insane person could be tried, sentenced or executed: *Commonwealth ex rel. Smith v. Ashe,*

---

[1] The two periods of acute mental disturbance referred to in the answers to the three questions submitted by the court occurred, according to the commission's report, ". . . the first time in the jail at the time of his commitment and the second time while in the hospital after the Commission first met." and the commission found that "On both occasions his disturbance promptly subsided.".

*Warden et al.*, 364 Pa. 93, 116, 71 A. 2d 107; *Common-wealth v. Patskin,* supra, p. 377. The common law concept of insanity to be applied by a jury in determining guilt where insanity is set up as a defense against conviction was the so-called "right or wrong" test laid down in *M'Naghten's Case,* 8 Eng. Rep. 718, 10 Cl. & Fin. 200, and subsequently adopted as the law of Pennsylvania in *Commonwealth v. Charles Mosler,* 4 Pa. 264. While the *M'Naghten* rule has been criticized, it remains the law of Pennsylvania when insanity is pleaded at trial: See *Commonwealth v. Carluccetti,* 369 Pa. 190, 200 (1952), 85 A. 2d 391. However, the test at common law and employed by the courts in determining the mental capacity of a defendant to stand trial or to be sentenced or executed is not the *M'Naghten* "right or wrong" test but whether the defendant is able to comprehend his position and make a rational defense. In *Commonwealth v. Scovern,* 292 Pa. 26, 140 A. 611, at p. 29 it was stated: "A person who, by reason of his insanity, is unable to comprehend his position and to make a rational defense cannot be tried on a criminal charge while in that condition . . .". In *Commonwealth v. Ragone,* 317 Pa. 113, 176 A. 454, this Court said, quoting from Blackstone's Commentaries, " '. . . If, after he [the defendant] be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if after judgment he becomes of nonsane memory, execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution.' ". As stated by Professor Weihofen in his book "Mental Disorder as a Criminal Defense" (1954) at p. 459: "After a verdict of guilty and before sentence is pronounced, if a defendant is found to be incapable of comprehending the nature and purpose of the proceed-

ings or of stating any reasons that may exist why sentence should not be pronounced, sentence should be stayed and the defendant, committed as an insane person until he recovers.".

It is apparent from the three questions which the court submitted to the commission and the opinions accompanying its orders that it was of opinion that the common law test for determining mental capacity at this stage of the proceedings had not been altered by the Act of 1951. If this conclusion were sound, we would not hesitate in subscribing fully to the court's findings and order. The commission found as a fact that appellant ". . . knew why he was in jail . . ., knew that he faced a sentence in accordance with the jury verdict . . ., knows that he is on trial for his life . . ., recalls his trial . . ., admits that no one is justified in taking anyone else's life . . ., knows that it is not right to shoot anybody . . ., and what the consequences of his acts might be . . .". The commission examined the appellant at some length as to his ability to cooperate with his attorneys, but made no specific finding in this regard. Appellant's attorneys made statements before the commission that appellant was unable to adequately cooperate with them, but the court, stating that "The defendant's own words and thoughts, as expressed by him in his own testimony before the Sanity Commission refute these opinions.", found that ". . . the defendant, understands the nature of the proceedings against him, comprehends his position in relation thereto, and is able to cooperate with his attorneys, . . .". We have read all of defendant's testimony, not only before the sanity commission but at his trial, and are satisfied that, under the law as it existed prior to any legislation on the subject, the court below committed no error of law nor any abuse of discretion. However, the question presents itself whether the com-

mon law test has been superseded in Pennsylvania by statutory enactment.

The history of legislation dealing with the custody of persons charged with and acquitted or convicted of crime who become mentally ill begins with the Act of May 14, 1874, P. L. 160, but for purposes of this case we are particularly concerned with the present Mental Health Act of 1951 and its predecessor, the Act of July 11, 1923, P. L. 998. Section 308 of the Act of 1923 provided: "When any person *detained in any prison*, whether waiting trial or undergoing sentence . . . shall, in the opinion of the . . . warden, . . . be *insane*, or in such condition as to make it necessary that he be cared for in a hospital for mental diseases, the said . . . warden, . . . shall immediately make application, . . . to a law judge of the court having jurisdiction of the charge against said person, or under whose order he is detained, for commitment of said person to a proper hospital for mental diseases. The said judge shall forthwith order an inquiry . . . by a commission . . . who shall immediately examine the said person and make written report of their findings to the said judge . . . The said judge may, in his discretion, summon other witnesses and secure further evidence. If he is then satisfied that the person thought or alleged to be *insane* is in fact *insane*, he shall order the removal of such person to a hospital for mental diseases . . .". (Emphasis supplied). We construed the language "any person detained in any prison, whether waiting trial or undergoing sentence" as including a person sentenced to death, since a part of his sentence is that he be imprisoned until his execution: *Commonwealth ex rel. Smith v. Ashe, Warden et al.*, supra, p. 117. To this extent the 1923 Act adopted the common law rules relative to a stay of execution for a defendant who became insane subsequent to verdict.

The Mental Health Act of June 12, 1951, P. L. 533, as amended, 50 PS §§1071-1622, was the first general revision and comprehensive codification of the Mental Health Laws since the Act of 1923. Under Section 343 of this Act the trial court is empowered to defer sentence and order a mental examination of any person convicted of a crime punishable by sentence to a penal or correctional institution. While this section would appear to restrict the application of the Act solely to persons convicted of crimes punishable by sentence to a penal institution, as previously indicated, Section 344 covers persons *detained* in any penal institution and it impliedly includes persons convicted of first degree murder who are mentally ill by expressly excluding in that classification only mental defectives: Cf. *Commonwealth ex rel. Smith v. Ashe, Warden et al.,* supra. Section 345 of the Act provides that after receipt of the application for commitment and notice to the prisoner's counsel and an examination of the person sought to be committed by a commission, " (d) *If the court is satisfied* that the person sought to be committed is *mentally ill* or *mentally defective,* it shall order the commitment or transfer of such person to a mental hospital or an institution for mental defectives . . .". (Emphasis supplied)

It will be readily observed that the basic dissimilarity between Section 345 of the Act of 1951 and Section 308 of the Act of 1923 is the substitution of the words "mentally ill or mentally defective" in the later enactment for the term "insane" in the earlier Act. This difference in terminology is employed with substantial uniformity throughout the 1951 Act. On the ground that this change of language in the 1951 legislation signifies a change of meaning by the Legislature in order to bring penology into closer accord with present day medical science, appellant contends that

the court below abused its discretion and committed an error of law in applying the common law test of insanity rather than the statutory standard of mental illness. It is a canon of statutory construction that where words of a later statute differ from those of a previous one on the same subject, they presumably are intended to have a different construction: *Fidelity Trust Company v. Kirk et al.*, 344 Pa. 455, 25 A. 2d 825; *Panik v. Didra*, 370 Pa. 488, 88 A. 2d 730; *McFarland Estate*, 377 Pa. 290, 296, 105 A. 2d 92.

The term "mental illness" is defined in Section 102(11) of the 1951 Act as "... *an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care.* The term shall include 'insanity', 'unsoundness of mind', 'lunacy', 'mental disease', 'mental disorder' and all other types of mental cases, but the term shall not include 'mental deficiency', 'epilepsy', 'inebriety', or 'senility', unless mental illness is superimposed.". (Emphasis supplied). Although this definition includes insanity, we disagree with the lower court's conclusion that it comprehends only legal insanity. It also expressly embraces " 'mental disease', 'mental disorder' and all other types of mental cases", thereby indicating that the statute was intended to comprise mental abnormalities which would not come within the strict connotation of the term legal insanity. Where the lawmaking body has the power to enact legislation in a particular field, as it has here, and has manifested its intention, we are not at liberty to distort the language of the enactment and by judicial legislation provide for what we might consider a more socially desirable result: *Mamlin v. Genoe et al.*, 340 Pa. 320, 17 A. 2d 407. When Section 345 of the 1951 Act is read in conjunction with the stat-

utory definition of mental illness, we think it plain beyond cavil that the Legislature has broadened the test to be used in staying criminal proceedings.

To what extent has the test been enlarged? At first glance the wordage of the Act would make it appear that every conceivable type of mental illness, with the exception of those specifically excluded, would fall within its scope and require commitment. Upon closer scrutiny it becomes evident that the controlling factor is the degree or extent to which the mind is affected by the mental disorder and not the bare existence of symptoms which would induce a psychiatrist to diagnose a mental illness. This conclusion is confirmed by Section 343(c) of the Act which provides that "On the report of the examiner that the defendant is *so* mentally ill or defective that it is advisable for his welfare or the protection of the community that he be committed to other than a penal or correctional institution, the court may commit him, . . . If the examiner's report indicates no *such* mental illness or deficiency, he shall be sentenced as in other cases.". (Emphasis supplied). Here the commission found that appellant possessed well marked symptoms of psychosis which it further characterized as dementia praecox. This condition, a recognized form of mental disorder was, if justifiably diagnosed,[2] within the purview of the Act, but having resolved that appellant was mentally afflicted, the determinative issue was whether that illness *so lessened* his capacity to use his cus-

---

[2] In its opinion dismissing the exception to its order, the court said: ". . . it seems likely to the court that the symptoms on which the members of the Sanity Commission based their opinion that Norman W. Moon was mentally ill might well be exhibited by any one convicted of murder in the first degree by a jury which set the death penalty, under the stress of his confinement and contemplation of his fate . . .".

tomary self-control, judgment and discretion as to render it necessary or advisable for him to be under care. As clearly delineated in the statutory definition, this is the standard which the Legislature promulgated to guide the commission and the court.

Assuming the commission found appellant a proper subject for commitment under this standard, its findings while persuasive were nevertheless advisory only and not mandatory upon the court, for under Section 345(d) of the Act it is the court and not the commission which must be satisfied that appellant is mentally ill under the standard prescribed. It follows that the court in the instant case could have rejected, although not arbitrarily or capriciously, the commission's findings and conclusions and could have independently determined from the evidence that appellant's capacity to use his customary self-control, judgment and discretion had not been so lessened that it was necessary or advisable for him to be under care. In view of the fact, however, that the court, in misapprehending the effect and intendment of the 1951 Act, did not apply this standard it thereby committed an error of law, and we have no way of ascertaining whether it would have arrived at a similar conclusion under the criterion so laid down. Accordingly the commission's findings and recommendation must be reexamined and the evidence reconsidered by the court together with any additional relevant evidence in the light of the statutory definition of mental illness.

The order of the court below is reversed and the record is remanded for procedure consonant with this opinion.

DISSENTING AND CONCURRING OPINION BY MR. JUSTICE BELL:

Justice CHIDSEY'S opinion is excellent as far as it goes, but in two respects it does not go far enough.

The defendant was convicted of murder in the first degree; the jury rejected defendant's defense of insanity and fixed the penalty at death. A motion was made by defendant for a new trial but before that motion was disposed of and *before sentence,* a petition was presented to the Court for the appointment of a Sanity Commission under §*344* of the Mental Health Act of June 12, 1951, P. L. 533, as amended. Commitment was denied by the lower Court and the defendant took this appeal.

In *Commonwealth v. Patskin,* 375 Pa. 368, 100 A. 2d 472, where the appeal sur the petition for commitment was taken *after conviction of murder and sentence thereon,* we said (page 375):

"The Mental Health Act of 1951 is silent on the question of appellate review where commitment is denied. The law is now well settled that 'where the statute is silent on the question of appeal a review by certiorari may be had "in the broadest sense" and the court may consider the record, including the testimony, to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made.': Kaufman Construction Co. v. Holcomb, 357 Pa. 514, 519, 55 A. 2d 534; Commonwealth v. Cronin, 336 Pa. 469, 474, 475, 9 A. 2d 408, 411; Bureau of Highway Safety v. Wright, 355 Pa. 307, 49 A. 2d 783; Bangor Electric Co.'s Petition, 295 Pa. 228, 232, 145 A. 128; Clarke's Case, 301 Pa. 321, 326, 152 A. 92, 94.

"If a commission is appointed its findings are advisory and not mandatory upon the Court—under the Act it is the Court and not the psychiatrist or the

Sanity Commission which must be satisfied that the petitioner is insane or mentally ill. (Subsection (d) of §345.)"

Four important questions arise: (1) Is the appeal interlocutory; (2) What was the applicable test prior to The Mental Health Act of 1951; (3) What is the meaning of The Mental Health Act, as amended January 14, 1951 (1952), P. L. 2053, so far as it is applicable to persons convicted or sentenced for murder; and (4) Is this section of the Act valid?

The Court below after reviewing the evidence taken before the Sanity Commission and its report, as well as the evidence taken at the trial of the murder indictment, found that the defendant was *at the time of the petition legally sane,* refused the commitment, and ordered the proceedings in the criminal trial to continue.

All of the members of this Court are in accord: (1) That we will never knowingly permit an insane man to be tried or sentenced or executed: *Commonwealth v. Patskin,* 375 Pa., supra (p. 377); *Commonwealth ex rel. Smith v. Ashe,* 364 Pa. 93, 116, 71 A. 2d 107; *Commonwealth v. Scovern,* 292 Pa. 26, 140 A. 611; Blackstone's Commentaries, Book IV, §24, page 1440; 3 Coke's Inst. 4; (2) That when insanity is set up as a defense in a criminal trial the *M'Naghten* Rule (the right or wrong test) applies, i.e., did the defendant know the nature and consequences of his act and the difference between right and wrong: *M'Naghten's Case,* 10 Cl. & Fin. 200 (1843); *Commonwealth v. Patskin,* 375 Pa., supra; *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287; *Commonwealth v. Neill,* 362 Pa. 507, 67 A. 2d 276; and (3) the test applicable for a continuance because of alleged insanity or mental incapacity is not the right or wrong test, but the ability of the accused to comprehend the existing situation and to make or aid his counsel in making a proper de-

fense: *Commonwealth v. Ragone,* 317 Pa. 113, 124, 176 A. 454; *Commonwealth v. Scovern,* 292 Pa. 26, 140 A. 611. The humanitarian reason for this test is likewise the basic reason for The Mental Health Acts.

The petition for commitment under The Mental Health Act was an inseparable part of the case of *Commonwealth v. Moon* sur the indictment and trial for murder. The evidence taken at the murder trial was, as we have seen, relevant in the consideration and determination of the petition for commitment. The first question that arises therefore is:

When, in the preservation of Justice for all, and in the orderly administration of Law, should an appeal to this Court be allowed where the sanity or mental illness of a person convicted of murder (or voluntary manslaughter), but not yet sentenced, is raised?

The general rule is long and well established that a defendant has no standing to appeal, even after conviction, where no sentence or other final judgment has been entered against him: *Commonwealth v. Hall,* 173 Pa. Superior Ct. 285, 98 A. 2d 386; *Commonwealth v. Hicks,* 173 Pa. Superior Ct. 395, 98 A. 2d 478; *Commonwealth v. Trufley,* 170 Pa. Superior Ct. 200, 85 A. 2d 622; *Commonwealth v. Graham,* 170 Pa. Superior Ct. 343, 85 A. 2d 632; *Commonwealth v. Feldman,* 159 Pa. Superior Ct. 3, 46 A. 2d 332; *Commonwealth ex rel. Holly v. Ashe,* 368 Pa. 211, 82 A. 2d 244.

In *Commonwealth ex rel. Holly v. Ashe,* 368 Pa., supra, the Court said (page 218): " 'appeals may not be taken in criminal proceedings where judgment of sentence has not been passed.' "

In *Sullivan v. Philadelphia,* 378 Pa. 648, 107 A. 2d 854, the Court said: "Even with the consent of all interested parties, appellate jurisdiction of an interlocutory order or decree may not be assumed: Stadler v. Mt. Oliver Borough [373 Pa. 316, 95 A. 2d 776]. The

evident policy of the law in such regard is to preclude piecemeal determinations and the consequent protraction of litigation."

Especially in those cases where insanity or mental inability to properly defend himself is offered as a reason (for acquittal or) for a stay or a continuance of further proceedings, Pennsylvania has been very liberal in sustaining the rights of any person accused of crime. For example, in *Commonwealth v. Patskin,* 375 Pa., supra, the defendant, subsequent to conviction and sentence for murder and after affirmation thereof by this Court, petitioned for commitment under The Mental Health Act. This Court allowed an appeal since the Order of the Court below which dismissed the petition was a *final* Order; and on the basis of a broad certiorari we reviewed the entire record in that hearing and in the criminal case. But that case does not justify an appeal *before sentence* from an Order refusing commitment or from any other interlocutory Order.* Under similar circumstances, Courts of our

---

* This Court has consistently quashed as premature or interlocutory, appeals from orders, judgments or decrees which did not constitute a final disposition of the case, even though such "quashing" (a) necessitated trials or proceedings which often proved unnecessary and at times were obviously so, and (b) unnecessarily cost the party-appellant large sums of money, as well as waste of time and effort and considerable mental strain. See: *McGee v. Singley,* 382 Pa. 18, 114 A. 2d 141; *Sullivan v. Philadelphia,* 378 Pa., supra; *Epstein v. Kramer,* 374 Pa. 112, 96 A. 2d 912; *Stadler v. Mt. Oliver Borough,* 373 Pa. 316, 95 A. 2d 776; *O'Hara Township Election Case,* 370 Pa. 250, 87 A. 2d 788; *Mackowain v. Gulf Oil Corp.,* 369 Pa. 581, 87 A. 2d 314; *Marsh v. Commonwealth,* 16 S. & R. 319; *Bingham v. State,* 82 Okla. Crim. 305, 169 P. 2d 311; *Bulger v. People,* 61 Colo. 187, 156 P. 800; *Darnell v. State,* 24 Texas C. App. 6, 5 S.W. 522; *State ex rel. Lyons v. Chretien,* 114 La. 81, 38 So. 27; *Ex parte Chesser,* 93 Fla. 590, 112 So. 87. Even though I believe some of these decisions were unwise, they represent the law of Pennsylvania.

sister States have refused review of any nature: *Bingham v. State,* 82 Okla. Crim. 305, 169 P. 2d 311; *Bulger v. People,* 61 Colo. 187, 156 P. 800; *Darnell v. State,* 24 Texas C. App. 6, 5 S.W. 522; *State ex rel. Lyons v. Chretien,* 114 La. 81, 38 So. 27; *Ex parte Chesser,* 93 Fla. 590, 112 So. 87.

In *People v. Ross,* 344 Ill. App. 407, 101 N.E. 2d 112; in *People v. Cornelius,* 332 Ill. App. 271, 74 N.E. 2d 900; and in *Crocker v. State,* 60 Wis. 553, 19 N.W. 435, the defendant was found to be insane by the trial Court before or during the trial; nevertheless an appeal from an Order of Commitment was dismissed on the ground that the Order was interlocutory and therefore non-appealable.

This appeal should a fortiori be quashed (1) because it is clearly interlocutory; and (2) because of the Act of March 31, 1860, P. L. 427, §57; and (3) because of §347 of The Mental Health Act of 1951, as amended, supra; and (4) because the allowance of an appeal, if a commitment be ordered before the motion for new trial is disposed of, may result in injustice to the law-abiding people of Pennsylvania.

The Act of March 31, 1860, P. L. 427, §57, which governs appeals in homicide cases, reads as follows: *"Upon the trial of any indictment for murder*\* or voluntary manslaughter, it shall and may be lawful for the defendant or defendants to except to any decision of the court upon any point of evidence or law, which exception shall be noted by the court, and filed of record as in civil cases, and a writ of error to the supreme court may be taken by the defendant or defendants, after conviction and sentence."* This section of the Act is clear; it has never been amended, and it should be

---

\* Italics throughout, ours.

construed by the Courts in accordance with its clear meaning and intent.

Section 347 of The Mental Health Act of 1951, as amended, supra, provides (page 2067):

"Section 347. Effect of Commitment on Pending Criminal Proceedings. *If any person is committed* while awaiting indictment or trial, or has been arraigned or is being tried, proceedings against him shall be stayed until his recovery or sufficient improvement of condition. Upon his recovery or sufficient improvement of condition, if he was previously confined in a penal or correctional institution, he shall be returned upon proper order of the court to the penal or correctional institution from which he was transferred, for the disposition of the charges against him. If he was committed before trial, he shall be returned to the court having jurisdiction of him, for trial or such other disposition of such charges as the court may make."

Criminal proceedings against a defendant are to be stayed only if he is mentally ill and then only if he was committed while awaiting indictment or trial, or while he was being tried. Defendant obviously does not fall within this section.

Equally clarifying and analogous, §343(d) of The Mental Health Act of 1951, supra, provides (page 555): "(d) *When a defendant is committed to an institution, an appeal shall lie* in the same manner and with like effect *as if sentence* to a penal or correctional institution had been imposed, and may be taken by defendant or his counsel." This defendant was never committed and therefore an appeal is not authorized.

Moreover, if this defendant is committed before his motion for a new trial is disposed of, it may be many many years before he appears in Court for a re-determination of his sanity or mental condition. In the meantime the Court may forget what happened at the

trial when it comes to passing upon some alleged trial errors and other trial matters *particularly within the knowledge of the trial Judge,* or the trial Judge may die; also there will likely be a loss of witnesses or at least a dimming of their recollection. Dilatory or delaying tactics are well known devices employed by criminals to obstruct or defeat justice and such tactics or motions should be rejected by the Courts whenever reasonably possible.

On the other hand, if the lower Court first disposes of defendant's motion for new trial and then imposes a sentence upon the verdict and orders or refuses commitment, this Court can still preserve to defendant all his legal rights, including the question of his sanity or mental illness and his ability to aid counsel in properly defending him and/or in preparing a motion and reasons for a new trial. Moreover, it is pertinent to note that these questions can be determined by this Court within a period of a few months.

In the light of all the cases hereinabove cited and of the said Acts, and for the additional reasons hereinabove set forth, it is clear that the appeal in this case is untimely, premature, and interlocutory and should be quashed.

Three cases are relied on to sustain this appeal; all of them are so extraordinary in their facts as to stand alone and furnish no precedent for a case such as the instant one. In *Commonwealth v. Ragone,* 317 Pa. 113, 176 A. 454, defendant was convicted of murder with the penalty of life imprisonment. Although the time was ripe for sentence the trial Judge *refused* to sentence the defendant, but instead committed him. The Court wisely allowed defendant's appeal and said: "It is true that the rule is that 'there must be a final judgment or something in the nature of a final judgment before it is ripe for review in this court.' But

this rule has, in exceptional cases and to safeguard basic human rights, been construed as not being one of unyielding flexibility." Moreover, in that case *all* of the experts for the Commonwealth and for the defendant agreed before the trial that defendant was insane at the time of the killing and also at the time of the trial, and even the District Attorney protested to the trial Judge against the trial of a man whom they all agreed was insane.

In *Commonwealth v. Trunk et al.*, 311 Pa. 555, 167 A. 333, several defendants were tried together on a number of indictments charging offenses all of which were part of a continuous series of events, and the Court felt it was an injustice to the defendants to sentence them on certain indictments and suspend sentence on others. Under these peculiar circumstances the Court allowed an appeal from the indictments upon which sentence was suspended, as well as from the judgments of sentence. This Court recognized the general rule but held that under the exceptional facts there present, there was an abuse of judicial discretion in suspending sentence upon the bills upon which the Court below did not act.

In *Commonwealth v. Kilgallen*, 379 Pa. 315, 108 A. 2d 780, this Court allowed an appeal from the refusal of a motion to quash criminal indictments because the nature of the charges vitally *affected the public interest* and the defendant's constitutional rights were palpably violated, and the exceptional circumstances justified us in entertaining the appeal.

Obviously there is nothing so exceptional about the present status of the defendant as to bring him within the exceptional cases above set forth or require a departure from the well established rule. This long established principle of non-appealability of interlocutory orders, *especially in criminal cases,* prevents piece-

meal determination of such cases and thus enables the Court to more wisely and justly determine the questions involved in the light of *all* the facts and circumstances as disclosed by the evidence and the entire record. Equally important, it eliminates costly and time-consuming delays in the orderly and speedy administration of justice and places a needed restriction upon the well known practice of criminals to obstruct or defeat justice by resorting to every conceivable technicality, dilatory motions, and delaying tactics.

For all these reasons I would, I repeat, quash this appeal.

If the appeal is not quashed, we should affirm the judgment of the lower Court.

*The Mental Health Act of 1951*

The basic purpose of the Mental Health Acts is worthy i.e., to protect by hospitalization and medical care those who are *really* mentally ill. The Acts should be read in the light of that purpose and should not be used as a device to allow dangerous criminals to escape just punishment for their crimes, viz., life imprisonment in jail or execution in murder cases. The main purpose of such punishment, it is often forgotten, *is to deter crime and protect society.*

An Act or a section of an Act will be declared invalid and void when it is so indefinite or uncertain or so vague or ambiguous or confusing or its provisions are so inconsistent or conflicting or incomplete that the Courts are unable to determine, with any reasonable degree of certainty, what the Legislature actually intended: *Panther Valley Television v. Summit Hill,* 376 Pa. 375, 102 A. 2d 699; *Miller v. Belmont Co.,* 268 Pa. 51, 63, 110 A. 802; *Commonwealth v. DePofi,* 362 Pa. 229, 66 A. 2d 649; *Murray v. Philadelphia,* 364 Pa. 157, 71 A. 2d 280; *Gratton v. Conte,* 364 Pa. 578, 73 A. 2d 381; *Sablosky v. Messner,* 372 Pa. 47, 92 A. 2d

411; *Commonwealth v. Hallberg,* 374 Pa. 554, 97 A. 2d 849. Moreover, it should likewise be declared inoperative and void if the only meaning which can reasonably be given it will produce a result which is absurd, since there is a presumption that the Legislature never intended an unreasonable and absurd result. Cf. Act of May 28, 1937, P. L. 1019, §52, 46 PS 552.

As so often happens in a very long Act, some provisions thereof are uncertain or confusing or inconsistent or conflicting.

*Section 344* considered and construed with §343 and §102 of The Mental Health Act of 1951, P. L. 533, as amended 1951, January 14 (1952), P. L. 2053, is indefinite and uncertain and its provisions construed with others are conflicting, inconsistent and absurd.

Section 344 (a) (1), (2) and (c) (pages 2065-2066) reads as follows:

"(a) Petition for commitment of—

"(1) Any person detained in any penal or correctional institution who is thought to be mentally ill or in such condition that he requires care in a mental hospital, or who is thought to be a mental defective [or epileptic].

"(2) Any person charged with a crime and released on bail pending trial who is thought to be mentally ill or a mental defective [or epileptic] may be made to the court under the order of which such person is detained or which has jurisdiction of the charge.

. . .

"(c) *No application shall be made for the commitment of any mental defective convicted of first degree murder.*"

Section 344 says that a person who is mentally ill or a mental defective who is detained in jail may be committed to a mental hospital unless he is a mental defective who has been convicted of first degree mur-

der. In other words, a mental defective who is in jail and indicted for murder can be put in a mental hospital and never tried for murder, but if he has been convicted of first degree murder he cannot be committed to a mental hospital. This is so absurd that it could not have been the intent of the Legislature and cannot be sustained.

"Section 343. Commitment of Convicted Person in Lieu of Sentence After Report of Psychiatrist.—(a) Whenever any person is convicted of a crime punishable by sentence to a penal or correctional institution, the trial court may defer sentence and order a mental examination of the defendant to guide it in determining his disposition. Such action may be taken on the court's initiative, or on the application of the district attorney, the defendant, or his counsel or other person acting in his interest." This all-embracing section makes no exceptions. It pertains just as much to every mental defective who is convicted of first degree murder as does §344. Section 344(c) is inconsistent with and conflicting with (a) §343 as well as (b) Art. VII, §701, Murder, etc., Penal Code of 1939, P. L. 872, which authorizes the jury or the Court to fix the penalty at life imprisonment or death, and with (c) prior decisions of this Court which hold that a mental defective can be tried and convicted of murder and executed pursuant to sentence thereon.

*Section 102 (9)*, page 2055, defines a *mental defective* as "a person who is not mentally ill but whose mental development is so retarded that he has not acquired enough self-control, judgment and discretion to manage himself and his affairs, and for whose welfare or that of others care is necessary or advisable. The term shall include 'feeble-minded,' 'moron,' 'idiot' and 'imbecile,' but shall not include 'mental illness,' 'inebriate' and 'senile.' "

*Section 102 (11),* page 2055, defines *mental illness* as "an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care. The term shall include 'insanity,' 'unsoundness of mind,' 'lunacy,' 'mental disease,' 'mental disorder,' *and all other types of mental cases,* but the term shall not include 'mental [defectiveness] deficiency,' 'epilepsy,' 'inebriety,' or 'senility,' unless mental illness is superimposed."

Section 102 (9) and section 102 (11) apply equally to and equally govern a person who has not enough self-control, judgment and discretion to manage his own affairs and who for his own welfare *or that of others* needs care. A mental defective (a feeble minded person or moron) never possessed the above characteristics, to wit, such self-control, judgment and discretion; the lunatic, the insane and all persons suffering from any other mental illness, possessed them but lost them. The care, treatment and punishment for each mental class is equal except as to persons who may be *convicted* of first degree murder, in which case the mentally ill person who is otherwise sane, but has a delusion that he is Babe Ruth or Caruso or Napoleon or President of the United States, or has some other mental disorder or mental illness less severe than insanity, goes to a hospital and the mental defective, who is less able to exercise self-control, judgment and discretion, goes (as under our cases and under §344(c) he must) to the death chair or imprisonment in jail for life. There is no legal or humanitarian justification for such a distinction. It is contrary to the decided cases and if the Legislature wishes to permit a convicted murderer who is neither insane nor a mental defective to escape execution or life imprisonment in

jail, it is not asking too much to require it to amend the Penal Code and to clearly and unequivocally say so.*

To summarize: I would quash this appeal as interlocutory for the reasons hereinabove set forth. If the appeal is considered on its merits, I would hold that §344 of The Mental Health Act, purportedly relating to persons detained in jail or convicted of murder, is, when considered with other sections of The Mental Health Act and with the Act of March 31, 1860, so confusing, conflicting, uncertain and absurd, as to be void. I would therefore sustain the insanity test applied by the Court below and would remand the case to the lower Court for disposition of defendant's motion for a new trial and a sentence on the verdict or such other decision as it deems proper not inconsistent with this opinion.

---

* See also §342 of The Mental Health Act, which provides: "Whenever any person *charged with crime*, upon production or appearance before the court, appears to be mentally ill or in need of care in a mental hospital, the court shall designate a responsible person to apply for his commitment . . .". The mental defective is not provided for by this section or any similar section of the Act even though, by definition, he is suffering from the same loss of self-control, judgment and discretion as the person suffering from mental illness, and both are equally dangerous to society.