Daugherty et al., Appellants, *v.* Continental Can
Co., Inc.

Argued April 9, 1973. Before WRIGHT, P. J., WAT-KINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*William C. Schwartz,* with him *Lipsitz & Nassau,* for appellants.

*Robert H. Shoop, Jr.,* with him *Charles C. Hewitt,* and *Thorp, Reed & Armstrong,* for appellee.

OPINION BY SPAETH, J., December 11, 1973:

This is an appeal from orders granting a compulsory nonsuit in two assumpsit actions. Appellants (plaintiffs below) are fifty-seven men and women who were employed by appellee, the Continental Can Co.,

Inc. (hereinafter "Continental"), at its Hazel-Atlas Glass Division in Washington, Pennsylvania, from May 1962 until February 1964, when Continental sold its business. Appellants are seeking back wages, an equal amount in liquidated damages, and other sums allegedly due them under the Equal Pay Law, Act of Dec. 17, 1959, P. L. 1913, §1, 43 P.S. §336.1 *et seq.*, as amended by the Act of July 31, 1968, P. L. 869, No. 262, §1, 43 P.S. §336.3 *et seq.* (Supp. 1973), which in pertinent part read as follows: "No employer shall discriminate in any place of employment between employes on the basis of sex by paying wages to any employe at a rate less than the rate at which he pays wages to employes of the opposite sex for work under comparable conditions on jobs the performance of which requires comparable skills, except where such payment is made pursuant to a seniority training or merit increase system which does not discriminate on the basis of sex." §3, 43 P.S. §336.3.

If appellants' claims are to be understood, some background must be stated. Under the terms of a collective bargaining agreement between Continental and appellants' duly recognized bargaining agent, the Glass Bottle Blowers Association of the United States and Canada (hereinafter "the Union"), selector-packers were paid at a base hourly rate of $1.965 if they were men, but $1.77 an hour if they were women; the men also received more per hour in bonus pay than the women. Because of this disparity, in 1960 some of the female employees filed an action under the Equal Pay Law in the Court of Common Pleas of Washington County. The lower court sustained Continental's preliminary objection on the ground that, since the Union represented both male and female employees, the collective bargaining agreement constituted a waiver of the plaintiffs' rights under the Equal Pay Law. This court affirmed. *Stollar v. Continental Can Co., Inc.,* 197 Pa.

Superior Ct. 15, 176 A. 2d 699 (1961) (MONTGOMERY, J., joined by FLOOD, J., dissenting). The Supreme Court reversed and remanded for further proceedings. *Stollar v. Continental Can Co., Inc.*, 407 Pa. 264, 180 A. 2d 71 (1962).[1]

By memorandum dated March 13, 1962, effective May 1, 1962, the Union entered into an agreement providing for the discontinuance of bonus plans and of all male classifications that duplicated female classifications. Thus, male selector-packers were classified the same, and received the same lower rate of pay, as female selector-packers. In addition, Continental offered to all employees whose bonus plans had been abolished an added 10½¢ per hour on the condition that the employee sign a waiver of any and all claims he or she might have under the Equal Pay Law.[2] As a result, the

---

[1] The record does not disclose what action was taken after the remand.

[2] The number of appellants who signed waivers in order to collect bonus pay does not appear on the record, although there is some evidence that several of them signed. It should be noted that one of the provisions of the Equal Pay Law of 1947, Act of July 7, 1947, P. L. 1401, 43 P.S. §335.1 *et seq.*, the predecessor of the statute involved here, read as follows: "Any employee may directly or through his attorney, agent, or collective bargaining representative waive, compromise, adjust, settle or release any claim such employee may have under this act, either before or after commencement of any suit thereon, and a waiver, compromise, adjustment, settlement, or release of any such claim by such employee or his attorney, agent or collective bargaining representative shall be a complete satisfaction of such claim and a complete bar to any action based on such claim." §4(c), 43 P.S. §355.4(c). This provision was not included in the Equal Pay Law of 1959. Both versions provided that "[a]ny agreement between the employer and an employee to work for less than the wage to which such employee is entitled . . . shall be no defense to such action." §4(a), 43 P.S. §335.4(a) ; §5(a), 43 P.S. §336.5. This passage was the basis for the Supreme Court's ruling in *Stollar v. Continental Can Co., Inc., supra.* Since on this appeal no allegation is made by Continental that the waivers executed by appellants bar them from pressing their suits under the Equal Pay

maximum wage rate for selector-packers was a uniform $1.875 per hour.

The actions now before this court were filed on March 4, 1963. Each proceeds on the theory that an employer who has been guilty of wage discrimination cannot bring himself into compliance with the Equal Pay Law by reducing the wage rate of the group that he formerly favored or by paying both groups at some in-between rate; rather he must increase the wage rate of the group that he has discriminated against, making it the same as the rate at which he paid the favored group. Because the statute provides that "[a]ny action pursuant to the provisions of this act must be brought within one year from the date upon which the violation complained of occurs," §5(b), 43 P.S. §336.5(b), the actions relate only to the period from March 5, 1962, through March 4, 1963. They were submitted together, on the pleadings and stipulated facts. The trial judge granted Continental's motions for compulsory nonsuit and denied appellants' request to amend their complaints to include violations occuring after May 1, 1963. A court en banc affirmed.

Because we find that the lower court properly granted Continental's motions for compulsory nonsuit, we do not reach the question whether appellants should have been permitted to amend their complaints.

Appellants place heavy emphasis on the goals that equal pay legislation might have. Among the possible goals the following four seem to be the most prominent: to end wage discrimination practiced against female employees performing tasks comparable to those per-

---

Law of 1959, we do not have to determine the effect either of the waivers or of the failure to include in the Equal Pay Law of 1959 a provision specifically dealing with waivers. See *Commonwealth v. Moon*, 383 Pa. 18, 117 A. 2d 96 (1955) (where reenactment contains different words, different construction is intended).

formed by male employees; to improve the financial status of female employees by assuring them salaries equal to those paid male employees performing comparable tasks; to strengthen the job security of male employees who face the threat of replacement by lower paid female employees; and to improve the financial condition of male employees who, faced with competition from lower paid female employees, accept lower wages for themselves.[3] With the identification of these

[3] In compiling this list numerous sources have been relied on. *Stoller v. Continental Can Co., Inc., supra,* and Opinion of the Attorney General, Equal Pay for Equal Work, 22 D. & C. 2d 299 (1960), deal with the Pennsylvania statute involved in this case. Equal pay legislation was considered by the United States Congress in 1962 and 1963, when it finally enacted the Equal Pay Act of 1963, 29 U.S.C. §206(d)(1) (1970), which reads as follows: "No employer having employees subject to [the federal minimum wage law] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . . *Provided,* That an employer who is paying a wage differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." The extensive debates, hearings and reports which preceded passage of this measure, plus some recent court decisions dealing with it, suggest general purposes equal pay legislation such as Pennsylvania's might serve. Among the materials that have been consulted are the following: Hearings on H.R. 898 and H.R. 10266, Before the Select Subcomm. on Labor of the House Comm. on Educ. and Labor, 87th Cong., 2nd Sess. (1962); Hearings on S. 2494 and H.R. 11677 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 87th Cong., 2nd Sess. (1962); 108 Cong. Rec. 14747-14782 (1962); Hearings on H.R. 3861 and Related Bills Before the Special Select Subcomm. on Labor of the House Comm. on Educ. and Labor, 88th Cong., 1st Sess. (1963); *Shultz v. First Victoria Nat'l Bank,* 420 F. 2d 648 (5th Cir. 1969).

goals, appellants reason as follows: To permit an employer to lower the wages paid to males as a means of ending a wage pattern that discriminated against females ends the discrimination by wiping out any disparity between the wages paid males and females, but it does not improve the economic lot of the females, and it puts the males in a worse financial position than before. Paying a sum somewhere between that formerly paid males and that formerly paid females is of some benefit to the females, but not to the males. If an employer were required to raise the salaries of the females, however, all four of the goals would be accomplished.

One difficulty with this argument is that it ignores the fact that there is no provision in the Equal Pay Law that to comply with the statute an employer must raise the wages paid female employees against whom he has discriminated, and we cannot add "a requirement which the legislature did not see fit to include." *Commonwealth v. Rieck Inv. Corp.*, 419 Pa. 52, 60, 213 A. 2d 277, 282 (1965). *See also Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 187 A. 2d 575 (1963); *Olyphant Borough School District v. American Surety Co.*, 322 Pa. 22, 184 A. 758 (1936).

Nor is there any ambiguous language in the statute that provides an excuse for reading into it a requirement such as appellants advance. The Equal Pay Law is violated when an employer "discriminate[s] . . . by paying wages to any employe at a rate less than the rate at which he pays wages to employes of the opposite sex" for comparable work. After Continental lowered the wages paid its male employees, it was no longer acting in violation of the statute. The words of the statute leave no doubt about that; they are free from obscurity and ambiguity and are incapable of two or more meanings. If it were otherwise, we would be required to rely on legislative intent in choosing among

the possible meanings. *See Philadelphia v. Schaller,* 148 Pa. Superior Ct. 276, 281, 25 A. 2d 406, 409 (1942). In the absence of ambiguity, however, we have no occasion to be concerned with legislative intent. It is an established rule of statutory construction that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. S. §1921 (1973).

In addition, in 1968, the following provision was added to the Equal Pay Law: "Provided, that any employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." §1, 43 P.S. §336.3(a) (Supp. 1973).[4] As noted in *Funk v. Buckley & Co., Inc.,* 158 Pa. Superior Ct. 586, 593, 45 A. 2d 918, 921-22 (1946): "A material change of the language of an original act always indicates a legislative intent to effect a change of legal rights. Fidelity Trust Co. v. Kirk, 344 Pa. 455, 25 A. 2d 825; Commonwealth v. Lowe Coal Co., 296 Pa. 359, 145 A. 916, Ogilvie's Estate, 291 Pa. 326, 139 A. 826. And a radical change in the phraseology of a statute . . . is a legislative declaration that the law so amended did not as originally framed embrace the amending provision. MacFarland v. Unemployment Compensation Board of Review, 158 Pa. Superior Ct. 418, 45 A. 2d 423; 59 C.J., Statutes, §647; 50 Am. Jur., Statutes, §337."

Even if we were free to interpret the statute with reference to its possible goals, we would not be obliged to hold that an employer must increase the wages of employees against whom he has discriminated. It would be sufficient if we merely read the statute as barring wage discrimination based on sex. Perhaps the Gen-

---

[4] There is a similar proviso in the federal statute, *supra* note 3.

eral Assembly intended only this narrow goal for the Equal Pay Law. This was in any event its "primary purpose." *Stollar v. Continental Can Co., Inc., supra,* at 268, 180 A. 2d at 73. It must be remembered that the Equal Pay Law is not a minimum wage law. Pennsylvania has since 1937 had a minimum wage law covering women. Act of May 27, 1937, P. L. 917, §1, 43 P.S. §331a *et seq.;* The Minimum Wage Act of 1961, Act of Sept. 15, 1961, P. L. 1313, §2, 43 P.S. §333.1 *et seq.;* The Minimum Wage Act of 1967, Act of Jan. 17, 1968, P. L. 11, No. 5, §2, 43 P.S. §333.101 *et seq.* The Minimum Wage Law fixes the wage rates of certain workers; nothing indicates that the Equal Pay Law was intended to duplicate this function. Viewing the Equal Pay Law merely as an anti-discrimination law leaves an employer with some flexibility in the event he cannot financially raise the wages of the group against whom he has discriminated. Consider the following ing statements made by Elizabeth S. Johnson, Director of the Bureau of Women and Children of the Pennsylvania Department of Labor and Industry, before the Select Subcommittee on Labor of the House Committee on Education and Labor, on the administration of the Equal Pay Law:

"In spite of our success in a few cases, we have not been able to move forward as effectively as the problem calls for. Where the size of the wage differential or the number of workers involved is small, adjustments to secure compliance are not usually difficult to arrange.

"The big problem comes when the number and proportion of workers affected is high and the size of the wage differential is large. The problem may be further compounded when a corporation's plants are operating in several States and management can shift production from one state to another.

"The department of labor and industry has not yet succeeded in getting compliance in several cases of clear-cut violation for this reason. In one Pennsylvania plant of a corporation with plants in other States, 441 women are being paid approximately 20 cents per hour less than 239 men in the same occupation—a major one in the business.

"To immediately raise the women's rates to the men's would increase the annual wage cost by $176,000 a year. The manufacturer threatened to move his Pennsylvania production to newer facilities in other States. The department consented to allow the company some time to come into compliance by transferring the men to other jobs.

"However, the location of the plant and the relatively few openings for men in other occupations and the union security rights created problems that have made this approach to compliance impracticable.

"I might add, also, that many people would question the propriety of considering any such adjustment a proper one, but we were in a difficult position because we did not want to see the men put out on the streets." *Hearings on H.R. 898 and H.R. 10266, supra* note 3, at 125. There should be a clear indication that the legislature wanted to limit the options of employers, before the Equal Pay Law is read to require higher wages for some workers. There is none.

The orders of the court below are affirmed.